**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 3:08-CV-0064(MRK) |
| DIEGO MARIANO ROLANDO a/k/a ROCLERMAN and ROC d/b/a IA TRADING.COM INC., | |
| Defendant. | |

## RULING AND ORDER GRANTING DEFAULT JUDGMENT, PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND ANCILLARY EQUITABLE RELIEF AGAINST DEFENDANT DIEGO MARIANO ROLANDO A/K/A  ROCLERMAN AND ROC D/B/A IA TRADING.COM INC.

On January 15, 2008, plaintiff United States Commodity Futures Trading Commission (CFTC) filed its Complaint for Injunctive and Other Equitable Relief and for Civil Monetary Penalties.  The Complaint [doc. # 1] alleged that defendant Diego Mariano Rolando a/k/a Roclerman and ROC d/b/a/ IA Trading.com Inc. (collectively referred to as "Mr. Rolando") engaged in a multi-million dollar fraudulent investment scheme involving commodity futures contracts (futures) and options on commodity futures contracts (options).  Specifically, the Complaint alleged violations of §§ 4b(a)(2)(i)-(iii) and 4c(b) of the Commodity Exchange Act, as amended (the "Act"), 7 U.S.C. §§ 6b(a)(2)(i)-(iii) and 6c(b), and § 33.10(a)-(c) of the CFTC's Regulations (the "Regulations"), 17 C.F.R. § 33.10(a)-(c) (2007).  The Complaint sought, among other things, injunctive relief, disgorgement, restitution, and a civil monetary penalty.

Mr. Rolando's Answer was due on or before February 5, 2008, but to date, he has not filed or served his Answer. On February 13, 2008, the CFTC, pursuant to Rule 55(a) of the *Federal Rules of Civil Procedure*, served and filed its Request for Clerk's Entry of Default [doc. # 26] against defendant. The Clerk of the Court entered the default [doc. # 27] against Mr. Rolando on February 14, 2008.

The CFTC now has submitted its Application for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalty, and Ancillary Relief [doc. # 79] ("Default Judgment Application") against Mr. Rolando pursuant to Rule 55(b)(2) of the *Federal Rules of Civil Procedure*. Having considered carefully the Complaint, the allegations of which are well-pleaded and hereby taken as true, the Application for Default Judgment, and related filings by the Receiver, the Court GRANTS the CFTC's Application for Default Judgment and enters the following findings of fact and conclusions of law finding Mr. Rolando liable as to all violations alleged in the Complaint. Accordingly, the Court now issues the following Order for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalty, and Ancillary Relief Against Defendant, which determines that Mr. Rolando has violated §§ 4b(a)(2)(i)-(iii) and 4c(b) of the Commodity Exchange Act, as amended, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) and 6c(b) (2002), and § 33.10(a)-(c) of the CFTC's Regulations (Regulations), 17 C.F.R. § 33.10(a)-(c) (2007).

## I. FINDINGS OF FACT

### A. Parties

The United States Commodity Futures Trading Commission is an independent federal regulatory agency of the United States that is charged with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq*., and the Regulations, 17 C.F.R. §§ 1.1 *et seq.*, promulgated thereunder.

Diego Mariano Rolando a/k/a Roclerman and ROC and d/b/a IA Trading, age 30, is a citizen of Buenos Aires, Argentina. Since at least 2005, Mr. Rolando—individually and doing business as IA Trading—has been actively trading in the U.S. financial markets through accounts he held and/or controlled at Interactive Brokers LLC ("IB"), a futures commission merchant and broker-dealer located in Greenwich, Connecticut. Neither Mr. Rolando nor IA Trading has ever been registered with the CFTC in any capacity. Further, IA Trading is not incorporated in the United States; although, www.IATrading.com (IATrading.com) lists a Scarsdale, New York address on its domain registration.

**B.    Overview of the Fraudulent Investment Scheme**

From 2005 to 2007, through IA Trading and its website IATrading.com, Mr. Rolando operated a fraudulent investment scheme in which he solicited millions of dollars from hundreds of customers residing in the United States and around the world. Although most of his customers were from Argentina, his customers also included citizens of the United States, England, Italy, Spain, Panama, Paraguay, and Venezuela. Ultimately, based on Mr. Rolando's misrepresentations, these customers invested more than $34 million in his fraudulent scheme, the details of which are described below.

**1.    IA Trading, IATrading.com, and www.Roclerman.com**

Mr. Rolando operated his investment scheme through a phony company called IA Trading. With the assistance of numerous brokers and his IATrading.com and www.Roclerman.com websites, Mr. Rolando was able to convince customers that IA Trading operated a sophisticated financial operation, complete with its own trading platform. Further, IATrading.com stated that IATrading was an affiliate of the U.S. brokerage firm IB; thus, falsely lending legitimacy and a U.S. connection to Mr. Rolando's operations. The materials Mr.

Rolando provided to customers even went so far as to incorrectly state that IA Trading's address was 1 Pickwick Plaza, Greenwich, Connecticut, which is IB's address. Additionally, Mr. Rolando and his brokers expanded their misrepresentations to state that IATrading.com provided a way to invest directly through IB. Specifically, the materials provided to his customers stated that "[t]he broker – IATrading.com Inc. – takes charge itself provid[es] the platform of access to the stock market, open[s] the account in the clearing house and the bank . . . [t]he 'clearing house' is: IB, LLC."

### 2. Defendant's Solicitation of Customers and Purported Trading Strategy

As part of his investment scheme, defendant solicited customers, both directly through written and oral communications and indirectly through a stable of brokers or other customers. Defendant and his brokers enticed potential customers to invest with IATrading by falsely representing that his investment system focused on conservative growth in highly rated stocks on U.S. markets. Defendant's Roclerman.com brochure stated that "[w]e trade only high-rated stocks and indexes." Defendant also misrepresented that trading would take place exclusively on the New York Stock Exchange or through the NASDAQ system.

### 3. Mr. Rolando's Management of Customer Accounts at IB

Mr. Rolando used IB, a clearing broker, as the company through which he conducted his actual trading activity, and he used IB's electronic platform to open investor accounts. As an initial step, in September 2005, Mr. Rolando completed an online application to open a third-party advisor account at IB seeking to have IB act as clearing broker for accounts under his control.[1] When submitting this application, Mr. Rolando represented to IB that all information he would provide to IB regarding his customers would be true and correct and that any

---

[1] Third-party advisor accounts at IB also are known as "Friends and Family" or "F" accounts.

documents he would provide to IB to open customer accounts would be reviewed by these customers and provided in an unaltered and original form. Mr. Rolando also indicated in the application that he was not required to be registered in Argentina as an investment advisor, commodity trading advisor, or their equivalent. IB accepted Mr. Rolando's application, and he was authorized to open accounts at IB for his customers.

Although Mr. Rolando's name appears as an advisor on only 30 customer accounts he opened at IB, he actually controlled the trading in approximately 420[2] accounts at IB. Pursuant to IB policy, unregistered advisors, such as defendant, are permitted to have only a certain number of managed accounts and only can manage $25 million in assets. To circumvent this policy, on hundreds of online account applications submitted to IB, Mr. Rolando fraudulently identified 24 different persons as "advisors" on customer accounts that he actually controlled.

Mr. Rolando was able to accomplish his fraudulent scheme by controlling the flow of information between his customers and IB. Prospective customers either logged onto IATrading.com and filled out account application forms or provided Mr. Rolando with account opening documents believing they were opening accounts at IATrading. After potential customers filled out the necessary forms and provided the requested information, Mr. Rolando would use the information to open new accounts at IB in the customers' names. Under normal circumstances, customers would have been able to access their accounts at IB directly by using an electronic password linked to their accounts, but Mr. Rolando intercepted this information and used it to maintain complete control over the accounts. The only thing the customers saw

---

[2] Mr. Rolando may have controlled as many as 473 accounts at IB between 2005 and 2007, but these additional accounts were apparently closed prior to the CFTC's filing of its Complaint or were so-called "joker" accounts that were not opened for the benefit of any particular customer—instead they were used by Mr. Rolando to facilitate the flow of funds and transactions between customer accounts.

was the fictitious account statements on IATrading.com, which used the same account number provided by IB. Instead of linking IATrading.com to the actual deposit, withdrawal, transfer, and trading activity occurring at IB, Mr. Rolando provided false trading and balance information on IATrading.com statements.

## C. Mr. Rolando's Fraudulent Conduct

### 1. Mr. Rolando Provided False Account Statements to Customers

Since at least October 2006, Mr. Rolando provided or caused to be provided false account statements to customers. He created these false customer account statements by periodically uploading a spreadsheet he created to IATrading.com. The positions and trades that customers saw when they logged onto IATrading.com were false and did not accurately represent positions and trades in each individual client account at IB. These false account statements misrepresented that customer funds were invested entirely in securities when, according to IB's records, over 95% of the notional value of products traded in customer accounts was in futures and options. The false account statements also misrepresented the value of customers' accounts. For example, one customer's IATrading.com account statement showed a balance of $256,551.64 as of November 13, 2007 when the actual balance of the customer's account at IB was $169,082.30.

Mr. Rolando used these false account statements to hide from customers the substantial losses the customers were incurring. By December 4, 2007, account statements issued by IATrading.com showed customer accounts having an artificially inflated collective value of approximately $40 million while IB's records for that same date showed these accounts having a collective value of only approximately $23 million. In large part, this disparity arose because, while Mr. Rolando's trading strategy had been profitable through 2006, in February 2007, he lost

$12 million in customer accounts trading S&P futures contracts, and, in October 2007, he lost $10 million in customer accounts trading oil futures contracts. Because these losses were offset by gains in other months, these transactions contributed to a cumulative loss in the customer accounts of approximately $7 to $8 million over this period.

### 2. Mr. Rolando Engaged in Fraudulent Unauthorized Trading

As part of the fraudulent scheme, Mr. Rolando never told customers that he was going to trade or had traded customer funds in futures and options. None of his solicitation materials mentions trading in futures and options. Further, no customer ever authorized him to trade futures or options. Nevertheless, Mr. Rolando began fraudulently trading millions of dollars in speculative and risky futures and options contracts starting in September 2005 and continuing through November 2007. Indeed, approximately 95% of the notional value of Mr. Rolando's trading activity took place in futures and options.

### 3. Mr. Rolando Provided False Customer Account Information to IB

As part of Mr. Rolando's fraudulent scheme, he caused IB to have false records about customers. He did so by providing IB with false contact information when opening some customer accounts, changing the mailing addresses for some customer accounts to false addresses, and listing as trading advisors on some accounts individuals whom customers had not authorized to trade their accounts.

a) *He provided false contact information to IB when opening customer accounts*

When opening certain customer accounts at IB, Mr. Rolando provided false customer contact information including false e-mail addresses. This prevented IB, which sends account statements to its customers via e-mail, from contacting these customers. In some cases, Mr.

Rolando also provided to IB false addresses for customers and went so far as to substantiate these phony addresses using falsified documents. For example, one customer's account was opened at IB giving an address in Argentina of "Miguel Cane 2786 DTO 2, Haedo Norte, Haedo Norte 1706" and providing an Edesur electric bill purporting to confirm this address. In reality, this customer has never lived at this address and never submitted to Mr. Rolando or anyone associated with him a utility bill with this address. The e-mail and telephone numbers provided on the IB account opening documents for this customer were also false. Another example of a falsified customer's application contained a similar address in Argentina of "Benito Juarez 2787, Apartment 2, Haedo Norte, Argentina" and provided a MetroGas bill with the application to confirm this address. In reality, this customer lives in New York and never submitted to Mr. Rolando or anyone associated with him any information reflecting an address in Argentina. Similarly, the e-mail address provided on the IB account opening documents for this customer was false. These are just two of hundreds of examples of Mr. Rolando providing false information to IB in customer account opening applications.

b)    *He fraudulently changed customer mailing addresses on IB accounts*

During 2007, IB launched a security program through which it began mailing customers computer "tokens" to use when logging into their customer accounts online. Mr. Rolando did not want customers receiving these tokens from IB, whereby the customers would have been able to examine their true account statements online through IB's website; as a result, beginning no later than August 2007, he began changing his customers' physical addresses on their IB accounts. Mr. Rolando provided false contact information on at least 200 of these accounts, and according to IB records, several customers' contact information was changed to a series of

similar mailing addresses. In most instances, the similar addresses were provided in a slightly altered form to evade IB's computerized detection system. For example, on August 6, 2007, Mr. Rolando fraudulently changed the mailing address for several IB accounts related to one customer to "Calle Tandil 7344 #3 Mataderos C1440 Argentina." This customer has never lived at or otherwise been associated with this address and never requested that any information on his account be changed.

c)     *He supplied IB with false trading advisor information*

When opening certain IB customer accounts, Mr. Rolando listed trading advisors whom the customers had not authorized to trade their accounts. As described above, he fraudulently identified 24 different persons as "advisors" on customer accounts that he actually controlled. In many cases customers had advisors listed on their accounts that these customers do not and did not even know. According to Mr. Rolando, these "advisors" did not make any trading decisions for these customer accounts, and in many cases, they are and were unaware that they were listed as advisors on any customer accounts.

### 4. Mr. Rolando Made Material Misrepresentations and Omissions to Customers

Since at least May 2006, Mr. Rolando intentionally made or caused to be made—through his Roclerman.com brochure, IATrading.com, or otherwise—material misrepresentations and omissions to customers about his investment scheme.

a)     *He made material misrepresentations and omissions to customers about his trading strategy*

Mr. Rolando made material misrepresentations to customers about his trading strategy. As described previously, he told customers that he would trade only high-rated securities and security indexes in their accounts. This statement was simply untrue, as by September 2005, Mr.

Rolando had begun trading futures in customer accounts. Further, and as described in detail above, the substantial majority of trading in the IB accounts held or controlled by Mr. Rolando was in futures and options.

### b) *He made material misrepresentations and omissions to customers regarding IA Trading*

Mr. Rolando also intentionally made or caused to be made numerous material misrepresentations about IA Trading to customers. As described previously, he represented to customers that IA Trading had a trading platform, was an affiliate of IB, and had a U.S. address. In reality, none of these statements was true. While IB served as both the executing and clearing broker for the Rolando-related accounts, IB does not own or have any affiliation with IA Trading, and IA Trading has never been authorized to use IB's address. In reality, IA Trading was nothing more than a website operated by Mr. Rolando.

### D. Customer Losses

As of approximately January 26, 2008, customers' net deposits[3] with defendant were $34,038,590.39. On January 16, 2008, the date on which IB was served with a copy of the Court's Ex Parte Emergency Statutory Retraining Order, Appointment of Temporary Receiver, for Expedited Discovery and to Show Cause Regarding Preliminary Injunction [doc. # 6], the aggregate collective balance at IB of all the accounts relating to defendant was $23,446,890.88, reflecting a diminution of $10,591,699.51 of the net amount deposited by customers.[4] Further,

---

[3] In this context, net deposits equal total customer deposits minus total customer withdrawals. The net deposit information was obtained from IATrading.com, which as revealed by the Receiver's investigation, appears to contain as accurate a record of customers' deposits and withdrawals as is available.

[4] As of January 26, 2008, IATrading.com indicated that the aggregate collective balance for the IATrading.com accounts was $43,579,739.07. This was a false number that included fictitious profits and did not properly take into account monies that Mr. Rolando had returned to customers.

this $10,591,699.51 figure includes $995,633.56 in commissions charged to customers by defendant and his brokers, of which defendant received $197,125.52.

## II. CONCLUSIONS OF LAW

Rule 55(b)(2) of the *Federal Rules of Civil Procedure* provides that judgment by default may be entered by a district court. The grant or denial of a motion for default judgment lies within a district court's sound discretion. *See International Brands USA, Inc. v. Old St. Andrews Ltd.*, 349 F. Supp. 2d 256, 261 (D. Conn. 2004) (citing *Shah v. N.Y. Dep't of Civil Serv.,* 168 F.3d 610, 615 (2d Cir. 1999)). "[W]here a party fails to respond, after notice the court is ordinarily justified in entering a judgment against the defaulting party." *GE Group Life Assur. Co. v. Ruzynski*, No. 3:03CV1647, 2004 WL 243346, at *1 (D. Conn. Feb. 9, 2004) (quoting *Bermudez v. Reid,* 733 F.2d 18, 21 (2d Cir. 1984)). Further, if a district court determines that a defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true. *See* Fed. R. Civ. P. 8(b)(6) ("An allegation–other than one relating to the amount of damages–is admitted if a responsive pleading is required and the allegation is not denied."); *Pope v. United States*, 323 U.S. 1, 12 (1944); *International Brands USA, Inc.*, 349 F. Supp. 2d at 259 (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)).

The Court already has entered default against Mr. Rolando. As such, in accordance with Rule 55(b)(2), the allegations in the Complaint against Mr. Rolando will be taken as true, and as the Court is satisfied that those allegations demonstrate Mr. Rolando's liability as alleged in the Complaint, the Court hereby enters a default judgment against Mr. Rolando.

## A.    Jurisdiction

The Court has jurisdiction over the subject matter of this action and Mr. Rolando under §
6c of the Act, 7 U.S.C. § 13a-1, which authorizes the CFTC to seek injunctive relief against any
person whenever it shall appear that such person has engaged, is engaging, or is about to engage
in any act of practice constituting a violation of any provision of the Act or any rule, regulation,
or order thereunder.

Venue properly lies with the Court pursuant to § 6c(e) of the Act, 7 U.S.C. § 13a-1, in
that Mr. Rolando transacted business in the District of Connecticut, and the acts and practices in
violation of the Act occurred within this District, among other places.

## B.    The Act

In analyzing the CFTC's Application, the Court must bear in mind a crucial purpose of
the Act—"protecting the innocent individual investor—who may know little about the intricacies
and complexities of the commodities market—from being misled or deceived."  *CFTC v. R.J.
Fitzgerald & Co.*, 310 F.3d 1321, 1329 (11th Cir. 2002).  "*[C]aveat emptor* has no place in the
realm of federal commodities fraud.  Congress, the CFTC, and the Judiciary have determined
that customers must be zealously protected from deceptive statements by brokers who deal in
these highly complex and inherently risky financial instruments."  *Id.* at 1334.

## C.    Mr. Rolando Violated §§ 4b(a)(2)(i)-(iii) and 4c(b) of the Act
and § 33.10 (a)-(c) of the Regulations

The Act and Regulations prohibit, among other things, fraudulent conduct with respect to
futures and options transactions.  Section 4b(a)(2) of the Act makes it unlawful to cheat, defraud,
or deceive; to make or cause to be made a false report or statement, or cause to be made to such
other person any false report or record; or attempt to cheat, defraud, or deceive, other persons in

or in connection with futures trading for or on behalf of such persons. Similarly, § 4c(b) of the Act and § 33.10 (a)-(c) of the Regulations make it unlawful to cheat, defraud, or deceive; to make or cause to be made a false report or statement, or cause to be made to such other person any false report or record; or attempt to cheat, defraud, or deceive, any person in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any options transaction. Under each of these provisions, liability for fraud is established upon proof that: (1) a person or entity made a misrepresentation, misleading statement, or a deceptive omission; (1) that person or entity acted with scienter; and (3) the misrepresentation was material. *See R.J. Fitzgerald & Co.*, 310 F.3d at 1328; *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 445-47 (D.N.J. 2000) (analyzing §§ 4b(a) and 4c(b) claims together). As set forth below, these three requirements for fraud are satisfied fully in this case.

1.      **Mr. Rolando Made Misrepresentations and Omissions to Customers**

"Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" *R.J. Fitgerald*, 310 F.3d at 1328 (citing *Hammond v. Smith Barney Harris Upham & Co.* [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 at 36,657 & n.12 (CFTC Mar. 1, 1990)). As detailed above, Mr. Rolando misled his customers about their investments through the numerous misrepresentations and omissions of material fact he made during the course of his investment scheme. First, Mr. Rolando misrepresented to customers that their funds would be invested exclusively in securities. *See, e.g., CFTC ex rel. Kelley v. Skorupskas*, 605 F. Supp. 923, 932-33 (E.D. Mich. 1985) (finding that defendant's failure to, among other things, make trades in accordance with her representations constituted fraud in violation of the Act). Second, Mr. Rolando made numerous unauthorized trades in customer accounts in futures and options. *See, e.g., Rosenberg,*

85 F. Supp. 2d at 447-48 (finding that defendant's unauthorized trading in investor account constituted a misrepresentation in violation of the Act). Third, Mr. Rolando misrepresented to customers the value of and trading activity in customer accounts. *See id.* (finding that defendant violated the anti-fraud provisions of the Act by reporting to investor erroneous account balances and confirming trades he had not executed). Fourth, Mr. Rolando misrepresented the role of IA Trading in his investment scheme, misleading some customers to believe that IA Trading, among other things, had a trading platform, was affiliated with IB, and had a presence in the United States. *See, e.g., Saxe v. E.F. Hutton & Co.,* 789 F.2d 105, 112 (2d. Cir. 1986) (finding that defendant's misstatements about a firm's sophistication and the computerized trading program that would be used to make investor's trades could constitute material misrepresentations). With respect to Mr. Rolando's futures activities, each of these misrepresentations constitutes a separate violation of § 4(b)(a)(i) and (iii) of the Act, and with respect to his options activities, each of his misrepresentations constitutes a separate violation of § 4c(b) of the Act and § 33.10(a) and (c) of the Regulations.

Mr. Rolando also violated § 4b(a)(2)(ii) of the Act and § 33.10(b) of the Regulations by providing false account statements to customers that misstated the value of and trading activity in their accounts. *See, e.g., Skorupskas*, 605 F. Supp. at 932-33 (finding that defendant violated § 4b(a) of the Act by issuing false monthly statements to customers); *CFTC v. Sorkin*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,855 at 27,585 (S.D.N.Y. Aug. 25, 1983) (determining that distribution of false account statements which falsely report trading activity or equity is a violation of § 4b of the Act); *Rosenberg*, 85 F. Supp. 2d at 448; *CFTC v. McLaurin*, No. 95-C-285, 1996 WL 385334, at * 4 (N.D. Ill. July 3, 1996). Mr. Rolando also provided false

customer contact and trading advisor information to IB, which caused IB to have false records about customers in violation of § 4b(a)(2)(ii) of the Act and § 33.10(b) of the Regulations.

## 2. Mr. Rolando Acted with Scienter

The scienter element is established when an individual's acts are performed with an intent to deceive, manipulate, or defraud, or engaged in with knowing misconduct. *See SEC v. Prater,* 289 F. Supp. 2d 39, 53-54 (D. Conn. 2003); *Wasnick v. Refco, Inc.*, 911 F.2d 345, 348 (9th Cir. 1990) (citation omitted). The CFTC must demonstrate only that a defendant's actions were "intentional as opposed to accidental." *Lawrence v. CFTC*, 759 F.2d 767, 773 (9th Cir. 1985). Scienter requires proof that defendant committed the alleged wrongful acts intentionally or with reckless disregard for his duties under the Act. *See id.*; *Drexel Burnham Lambert, Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988) (finding that recklessness is sufficient to satisfy scienter requirement); *Do v. Lind-Waldock & Co.* [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,516 at 43,321 (CFTC Sept. 27, 1995) (determining that a reckless act is one where there is so little care that it is "difficult to believe the [actor] was not aware of what he was doing"); *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 774 (9th Cir. 1995).

In connection with futures and options transactions, Mr. Rolando made numerous material misrepresentations or omissions of material fact with the requisite scienter. He knew he was making misrepresentations to customers about their investments and omitting from customers material information about their investments. The Court finds that Mr. Rolando knew that: (1) the information he posted on IATrading.com was false; (2) the account statements he provided customers misrepresented the value of and trading activity in customer accounts; (3) the information concerning customer contacts and trading advisors he provided to IB was false; (4) he had never invested customer's funds exclusively in securities; and (5) IA Trading was not

owned by or associated with IB. The evidence of Mr. Rolando's scienter is buttressed by his admission to IB and to the Receiver that he made several of these misrepresentations to hide from customers what was truly occurring in their accounts and, thus, to perpetuate his fraudulent scheme.

### 3.    Mr. Rolando's Misrepresentations and Omissions Were Material

A statement is material if "there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision." *Rosenberg*, 85 F.Supp. 2d at 447 (citation and quotation marks omitted); *R.J. Fitzgerald*, 310 F.3d at 1328-29; *see also CFTC v. Commonwealth Fin. Group*, 874 F. Supp. 1345, 1353-54 (S.D. Fla. 1994). Further, any fact that enables customers to assess independently the risk inherent in their investment and the likelihood of profit is a material fact. *See In re Commodities Int'l Corp.,* [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,943 at 44,563-64 (CFTC Jan. 14, 1997) (finding that misrepresentations and omissions to customers were material and fraudulent because customers could not properly evaluate their circumstances with regard to risk of loss and opportunity for profit).

Mr. Rolando's misrepresentation that customer funds would be invested in only "high-rated" stocks and stock indexes was material because it mischaracterized the risk associated with customers' investments. Trading in futures and options is inherently risky. *See, e.g., R.J. Fitzgerald*, 310 F.3d at 1345 (explaining that "options trading is a risky business, and customers need to be told about the possibility of losing their entire investment"). As such, a reasonable investor would want to know that his funds were being invested in futures and options and the risks associated with that investment.

In addition, a reasonable investor would want to know that his account statements were false and that Mr. Rolando was engaging in unauthorized trading in the investor's account. A reasonable investor also would want to know that Mr. Rolando provided false contact information to IB to prevent the customer from receiving account statements and other communications from IB. Finally, Mr. Rolando's misrepresentations about IA Trading – including, among other things, that IA Trading was affiliated with IB and that IA Trading had a U.S. address – were material in that a reasonable investor would want to know that IA Trading was not a legitimate company, did not execute customers' trades, and was not affiliated with IB and that such statements were made to lend IA Trading an element of legitimacy that it would not otherwise have enjoyed. These misrepresentations relate directly to Mr. Rolando's credibility, integrity, and sophistication and would certainly affect a reasonable investor's decision about whether to invest, or to continue to invest, with Mr. Rolando. *See, e.g., Saxe*, 789 F.2d at 112 (finding that "the type of information that a reasonable investor might rely upon when choosing a trading advisor" is material).

**D.    Remedies**

**1.    Permanent Injunction Against Mr. Rolando**

In accordance with § 6c of the Act, 7 U.S.C. § 13a-1, the CFTC has made a showing that Mr. Rolando has engaged in acts and practices which violated §§ 4b(a)(2)(i)-(iii) and 4c(b) of the Act and § 33.10 (a)-(c) of the Regulations. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Mr. Rolando will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act. Based on the conduct described above, the Court enters a permanent injunction against Mr. Rolando enjoining him from:

(1)     violating § 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) -(iii);

(2)     violating § 4c(b) of the Act, 7 U.S.C. § 6c(b);

(3)     violating § 33.10(a)-(c) of the Regulations, 17 C.F.R. § 33.10(a)-(c);

(4)     engaging, directly or indirectly, in any activity related to trading in any commodity, as that term is defined in § 1a(4) of the Act, 7 U.S.C. § 1a(4); from trading on or subject to the rules of any registered entity, as that term is defined in § 1a(2) of the Act, 7 U.S.C. § 1a(2); engaging in, controlling, or directing the trading for any commodity interest account for or on behalf of himself or any other person; soliciting or accepting funds from any person or entity; and engaging in any business activities related to commodity interest trading; and

(5)     applying for registration or seeking exemption from registration with the CFTC in any capacity or engaging in any activity requiring registration or exemption from registration, except as provided for in § 4.14(a)(9) of the Regulations, 17 C.F.R. § 4.14(a)(9), and acting, directly or indirectly, as a principal, officer, director, supervisor, agent or employee of any person registered, required to be registered or exempted from registration, unless such exemption is pursuant to § 4.14(a)(9) of the Regulations, 17 C.F.R. § 4.14(a)(9). This includes, but is not limited to, soliciting, accepting or receiving any funds, revenue or other property from any person, giving commodity trading advice for compensation or soliciting prospective customers related to the purchase or sale of any commodity futures, security futures, options, options on futures, or foreign currency futures or

options, except as provided for in § 4.14(a)(9) of the Regulations, 17 C.F.R. § 4.14(a)(9).

## 2.     Return of Frozen Funds to Customers

At the outset of this matter, the Court froze $23,446,890.88 in accounts controlled by Mr. Rolando at IB.  Additionally, the Receiver has recovered an additional $378,963. in accounts controlled by Mr. Rolando at financial institutions other than IB.  According to the Combined Second Report and Application of Receiver [doc. # 50], the funds in all these accounts, including accounts held at IB and at outside financial institutions, originated from customers.  All these funds have been transferred to the Receiver.  These funds, along with any interest earned on these funds, should be returned to Mr. Rolando's customers (less any court-approved fees and expenses not covered by Mr. Rolando's assets in the possession of or recovered by the Receiver).[5]  The Court orders that these funds be distributed to Mr. Rolando's customers in accordance with the Receiver's distribution plan, which this Court has approved, and that Mr. Rolando's rights, if any, to the funds held by the Receiver be extinguished.

## 3.     Restitution

### a)     *The Court has authority to order restitution*

The Court's authority to order restitution is ancillary to the Court's authority to order injunctive relief under § 6c of the Act, 7 U.S.C. § 13a-1.  The Court's restitution authority is founded on the well-established legal principle explained by the Supreme Court in *Porter v. Warner Holding Co.*:

---

[5]  Under the Court's Order of Preliminary Injunction and Other Equitable Relief [doc. # 19], the Receiver should first be paid from the personal accounts and assets of Mr. Rolando.  As of this date, the Receiver has reported recovering additional assets from Mr. Rolando.

> Unless otherwise provided by statute, all the inherent equitable
> powers of the District Court are available for the proper and
> complete exercise of that jurisdiction. And since the public
> interest is involved in a proceeding of this nature, those equitable
> powers assume an even broader power and more flexible character
> than when a private controversy is at stake. Power is thereby
> resident in the District Court, in exercising this jurisdiction, "to do
> equity and to mould each decree to the necessities of the particular
> case."

328 U.S. 395, 398 (1946) (citations omitted). The Supreme Court later reaffirmed that principle

in *Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 296 (1960), where it found that the

district court had jurisdiction to order an employer to reimburse employees for lost wages in a

suit by the Secretary of Labor to restrain violations of the Fair Labor Standards Act. As the

court stated:

> "[T]he comprehensiveness of [the court's] equitable jurisdiction is not to be
> denied or limited in the absence of a clear and valid legislative command. Unless
> a statute in so many words, or by a necessary and inescapable reference, restricts
> the court's jurisdiction in equity, the full scope of that jurisdiction is to be
> recognized and applied."

*Id.* at 291 (quoting *Porter*, 328 U.S. at 397-98).

The Second Circuit has followed these principles in granting broad equitable powers to

district courts in enforcement matters brought by federal agencies. *See, e.g., SEC v. First Jersey*

*Sec., Inc.* 101 F.3d 1450, 1474 (2d Cir. 1996) (stating that a district court has broad equitable

power to fashion appropriate remedies). A district court's authority to grant a permanent

injunction also includes the power to grant other ancillary relief including the power to order a

defendant to pay restitution. *See FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 66 (2d Cir. 2006).

Likewise, district courts have followed these same principles in allowing the CFTC to seek

restitution on behalf of defrauded customers. *See CFTC v. United Investors Group, Inc.* 440 F.

Supp. 2d 1345, 1359 (S.D. Fla. 2006) ("The Court has authority to order restitution as ancillary

equitable relief.") (internal quotation omitted), *rev'd in part on other grounds,* 541 F.3d 1102 (11th Cir. 2008); *CFTC v. Commercial Hedge Servs., Inc.*, 422 F. Supp. 2d 1057, 1060 (D. Neb. 2006) (holding that law is well settled that court has authority to order restitution under the ancillary relief provision in 7 U.S.C. § 13a-1); *CFTC v. Midland Rare Coin Exch., Inc.*, 71 F. Supp. 2d 1257, 1264 (S.D. Fla. 1999) (holding that the CFTC may seek restitution in order to compensate victims of fraud).

Accordingly, the Court is satisfied that it has complete authority to issue ancillary equitable relief, including, but not limited to, ordering Mr. Rolando to make restitution for his violations of the Act, in addition to pre- and post-judgment interest. *See United Investors Group, Inc.*, 440 F. Supp. 2d at 1359-60 (determining that defendant must pay pre- and post-judgment interest on restitution award).

b)      *Defendant must pay restitution of $197,125.52*

The Second Circuit has determined that the proper measure of restitution is the benefit unjustly received by a defendant or a defendant's illegally gotten gains. *See Verity*, 443 F.3d at 68.  In this matter, Mr. Rolando fraudulently enticed customers to invest with him and, as a result and as discovered by the Receiver, Mr. Rolando received ill-gotten gains of $197,125.52 in commissions.  As such, Mr. Rolando is liable for $197,125.52 in restitution.  Further, Mr. Rolando is required to pay pre-judgment interest on this restitution amount to be paid at the then-prevailing underpayment rate established by the Internal Revenue Service pursuant to 26 U.S.C. § 6621 and post-judgment interest to be paid at the then-prevailing Treasury Bill rate pursuant to 28 U.S.C. § 1961.  All restitution payments and any corresponding interest awards are immediately due and owing.  Accordingly, the Court orders that these funds be distributed to Mr.

Rolando's customers pursuant to and consistent with the distribution plan approved by this Court.

### 4.      Civil Monetary Penalty

Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), provides that "the [CFTC] may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation [of the Act] a civil penalty."  For the time period at issue in the case at bar, the civil monetary penalty shall be "not more than the greater of $120,000 or triple the monetary gain to such person for each such violation."  Regulation 143.8(a)(1)(ii), 17 C.F.R. § 143.8(a)(1)(ii).

"In determining how extensive the fine for violations of the Act ought to be, courts and the [CFTC] have focused upon the nature of the violations" and their gravity.  *CFTC v. Noble Wealth Data Information Svcs., Inc.*, 90 F. Supp. 2d 676, 694 (D. Md. 2000), *aff'd in part, vacated in part by CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002).  In this regard, the CFTC has stated:

> "Civil monetary penalties serve a number of purposes.  These penalties signify the importance of particular provisions of the Act and the [CFTC]'s rules, and act to vindicate these provisions in individual cases, particularly where the respondent has committed violations intentionally.  Civil monetary penalties are also exemplary; they remind both the recipient of the penalty and other persons subject to the Act that noncompliance carries a cost.  To effect this exemplary purpose, that cost must not be too low or potential violators may be encouraged to engage in illegal conduct."

*CFTC v. Emerald Worldwide Holdings, Inc.*, No. CV03-8339, 2005 WL 1130588, at * 11 (C.D. Cal. Apr. 19, 2005) (quoting *In re GNP Commodities, Inc.* [1990-92 Transfer Binder] Com. Fut. L. Rep. (CCH) ¶ 25,360 at 39,222 (CFTC 1992)) (citations omitted).

The Court is satisfied that this case warrants a substantial civil monetary penalty. *See United Investors Group, Inc.*, 440 F. Supp. 2d at 1361 (determining that, among other things, "the gravity of the offenses, the brazen and intentional nature of the violations, [and] the vulnerability of the victims" justified "imposition of a substantial and meaningful [civil monetary] penalty"). Mr. Rolando concocted a brazen, fraudulent scheme and solicited hundreds to invest millions of dollars in his fraudulent investment scheme. His fraudulent conduct in, among other things, obtaining customer funds and then hiding his true conduct from his customers were serious violations of the Act, violations that strike at the very core of the Act's regulatory system. *See In re Premex*, Comm. Fut. L. Rep. (CCH) ¶ 24,165 at 34,890-91 (CFTC Feb. 17, 1988) ("[C]onduct that violates core provisions of the Act's regulatory system—such as manipulating prices or defrauding customers—should be considered very serious.").

Having heard form the CFTC and from the Receiver the Court believes that a civil monetary penalty in the amount of $10 million against Mr. Rolando is appropriate given the repeated and egregious nature of the defendant's fraudulent scheme and the millions of dollars of losses sustained by his customers. *See, e.g.*, *United Investors Group, Inc.*, 440 F. Supp. 2d at 1361. The civil monetary penalty is immediately due and owing, but only after Mr. Rolando's restitution obligation has been satisfied should any payments by Mr. Rolando be applied to satisfy any portion of this civil monetary penalty. Further, post-judgment interest on this civil monetary penalty should be awarded using the Treasury Bill rate prevailing on the date of the Court's final order in this matter, pursuant to 28 U.S.C. § 1961(a).

**E.      Miscellaneous Provisions**

**1.      Equitable Relief**

The equitable relief provisions of this Order shall be binding upon Mr. Rolando and any person who is acting in the capacity of agent, employee, servant, or attorney of Mr. Rolando, and any person acting in active concert or participation with Mr. Rolando, who receives actual notice of this Order by personal service or otherwise.

2.      **Notices**

All notices required to be given to the CFTC by any provision in this Order shall be sent certified mail, return receipt requested, as follows: Notice to CFTC: Attention - Director of Enforcement, Commodity Futures Trading Commission, Division of Enforcement, 1155 21st Street N.W., Washington, DC 20581.

3.      **Continuing Jurisdiction of this Court**

This Court shall retain jurisdiction of this case to assure compliance with this Order and for all other purposes related to this action.

In conclusion, the Court GRANTS the CFTC's Application for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalty, and Ancillary Relief [doc. # 79].

IT IS SO ORDERED.


/s/     Mark R. Kravitz_____
        United States District Judge


**Dated at New Haven, Connecticut: December 10, 2008.**